# Richmond

## AMERICAN CHLOROPHYLL, INC. v. FRANK M. SCHERTZ.

### November 25, 1940.

### Record No. 2270.

Present, Campbell, C. J., and Holt, Hudgins, Gregory, Eggleston and Spratley, JJ.

The opinion states the case.

*Albert V. Bryan* and *Howard W. Smith, Jr.,* for the appellant.

*Charles Henry Smith; Long, St. Lewis & Nyce* (Washington, D. C.), for the appellee.

GREGORY, J., delivered the opinion of the court.

Frank M. Schertz filed his suit in equity against American Chlorophyll, Inc. The purpose of the suit was to require a discovery and an accounting of royalties of the defendant under a certain contract of November 19, 1935, and the specific performance of the contract. The complainant also asked that the defendant, by whom he was employed, be required to pay him back salary of $1,675. The defendant does not contest the salary account and it need not be further considered in this appeal except in an incidental manner.

The parties entered into a written agreement on November 19, 1935, whereby Schertz agreed to deliver to the American Chlorophyll, Inc., certain secret processes for the extraction of chlorophyll, carotene, and xanthophyll from vegetable leaf matter for the latter's exclusive use for twenty-five years. The Chlorophyll, Inc., was to pay Schertz a royalty of five percent on the net sales of the products manufactured under the secret formulae. These royalties were to be paid quarterly, the first becoming due on January 1, 1936. Under clause 11 a statement of sales was to be rendered Schertz with each quarterly payment and "a

yearly audit shall be furnished for purposes of any royalty adjustments on account of sales."

Clause 8 of the contract provided: "In the event of a breach of any of the conditions of this agreement by either party (Licensee or Licensors) it shall be the duty of the other party to give written notice of said breach and its particulars and the party in error shall have thirty (30) days thereafter in which to comply after receipt of said notice. Upon failure to comply with the terms of the agreement by the party in error within said thirty (30) days, this agreement may be cancelled upon written notice, at the option of the party aggrieved."

The defendant manufactured products under the formulae, but never paid any of the royalties due Schertz from the inception of the contract in 1935 until it was finally terminated, under the circumstances noted below, in 1938, at which date eleven instalments were in default.

The prayer of the bill of complaint is that the American Chlorophyll, Inc., be required to disclose the gross and net invoice value of all products made since November 19, 1935; that a full and proper accounting be rendered to determine the amount due the complainant; "that the said defendant may be decreed specifically to perform the said contract * * * and to make full and complete accounting * * * that this court enter a decree for a money payment to your orator in such amount as a full and complete accounting and discovery * * * may show your orator to be entitled * * * ."

The American Chlorophyll, Inc., filed its answer and cross-bill. After certain denials in the answer it alleged in the cross-bill that Schertz, in violation of his obligation to maintain secrecy of the formulae, fully disclosed and revealed the principles thereof by causing an article to be published in a publication known as the "Industrial and Engineering Chemistry." The American Chlorophyll, Inc., alleged that the disclosure constituted a breach of the contract and it thereupon cancelled the contract in accordance with the terms set forth in clause 8.

It also alleged in its cross-bill that the disclosure was wrongful and wilful and by reason thereof the value of the license agreement was totally destroyed. As a result thereof the American Chlorophyll, Inc., alleged it had suffered great loss and damage which was far in excess of the claimed royalties and salary. It asked for damages for the alleged breach of the contract by Schertz.

The chancellor heard the case *ore tenus,* but by mutual agreement the evidence was not certified as a part of the record, because it was agreed that no question of fact was involved. Only a question of law is now presented.

The chancellor decreed that Schertz was entitled to his salary, amounting to $1,675. His employment was not a part of the written contract, and Schertz's right to the $1,675, as stated before, is not questioned.

The chancellor then decreed that the American Chlorophyll, Inc., "violated and breached its contract by not making the royalty payments" as provided in the contract; that the complainant Schertz by writing and sending the article to the chemical magazine, which published the article in its September, 1938, issue, unlawfully disclosed the secret formulae and thereby violated and breached his contract. Then Schertz was awarded a money decree for the royalties which had accrued prior to his disclosure of the secret formulae on September 1, 1938, aggregating $6,239.-51, that being the amount of royalties calculated on the net sales as provided in the contract.

The chancellor also decreed that the parties "are mutually discharged of * * * further liability * * * for damages, royalties, or other property, or property rights, under or by virtue of the terms of said contract." The American Chlorophyll, Inc., was denied a decree or judgment for any damages it claimed to have sustained by reason of the disclosure of the formulae. No proof of any such alleged damage was permitted and no set-off on account thereof was allowed against the amount of the royalties or salary. The prayer of the cross-bill was denied.

Counsel for the American Chlorophyll, Inc., assign error to that portion of the decree in which Schertz was allowed to recover any royalties under the contract and further to the failure of the court to allow it to set off its damages against the amount of the salary.

Error was also assigned to that portion of the decree which denied the American Chlorophyll, Inc., the right to recover damages against Schertz for the breach of the contract by him.

It would appear that the trial court, in holding that defendant's prior breach precluded any recovery on its cross-bill, did not give sufficient attention to section 8 of the contract, quoted *supra*. The briefs of both parties show that the word "conditions", as used therein, means simply "terms" or "provisions." Neither party imputes to the section any meaning or purpose other than that apparent on its face, which may be stated thus: If one party wishes to put an end to the contract because of the other party's breach, he must first give that other party the specified notice and an opportunity for a belated compliance.

It is admitted that on defendant's first breach of contract and on each of the successive breaches, complainant failed to comply with the provisions of this section. Thus it is clear that complainant never availed himself of the opportunity of putting an end to the contract. This can only be interpreted as an election to keep the contract in effect.

The general principles of election are stated thus in 3 Williston, *Contracts* (Revised Edition), section 688: "The principle is general that wherever a contract not already fully performed on either side is continued in spite of a known excuse, the defense thereupon is lost and the injured party is himself liable if he subsequently fails to perform, unless the right to retain the excuse is not only asserted but assented to. The case may be thought distinguishable where a party to a bilateral contract, knowing of a breach of condition or defense which would excuse him, continues to act under the contract in some other way than receiving benefits from the other party, for instance, con-

tinues to render performance himself, as if an employee having just ground for refusing to continue performance of his contract of employment, and, knowing the facts excusing him, nevertheless renders some further services. Is he thereby precluded from subsequently asserting the breach as an excuse for his own failure to perform the contract? This depends in theory upon the inquiry whether any element of estoppel is necessary to constitute a final election. The employee is entitled to choose between the prize of further employment with the pecuniary and other advantages that may flow from it, and the prize of freedom from his own liabilities under the contract. By continuing work he has manifested an intent to take the former, but he has benefited rather than injured the employer who will suffer no greater injury if the choice is revocable than he would have suffered if the employee had refused promptly to continue performance. It seems probable, nevertheless, that the election is final. Even silence when it is likely to mislead the other party and induce him to believe that further performance of the contract will be accepted may amount to an election."

In the case at bar, the argument for an election is even stronger, for the parties *specifically contracted* that no breach should be grounds for terminating the contract unless two notices were given, the first stating that a breach had occurred, and the second that the thirty-day "period of grace" had expired and the contract was henceforth at an end.

■ It should be made clear that there is no question here of waiver. Although "waiver" and "election" are sometimes loosely used as synonymous terms, they are in reality very different things. Complainant here has not waived his right to the eleven instalments of royalties due under the contract. In point of fact, he has done just the opposite, and has elected to keep the contract in existence, thus retaining his right to sue on the contract for the royalties due.

■■ While thus electing to keep the contract alive, complainant wrote and published the scientific treatise which the trial court has found to be a breach of the contract. He attempts to excuse this default by pointing to the defendant's prior default. This he may not do. His default could be excused only if there was already an end to the contract. As pointed out above, upon the non-payment of royalties complainant, both by general contract principles and by the specific provisions of section 8, had a right to put an end to the contract, but he did not do so. He performed fully his part of the contract up until September 1, 1938. He may not keep the contract alive for his own benefit, claiming the royalties thereunder, and at the same time excuse his default by averring that the contract was at an end. He may not in the same breath affirm and disaffirm.

■ Complainant's election, as evinced by his non-compliance with section 8, is final and conclusive unless the section can be shown to be illegal or against public policy, or unless some valid excuse can be made for non-compliance. The only argument urged by complainant with reference to this section is that defendant may not complain of complainant's non-compliance with section 8 when he himself was in default. This is an obvious *non sequitur*, for by the terms of section 8 complainant's compliance or non-compliance could come *only* when defendant was in default. The default was a condition precedent to the operation of section 8, and if defendant's default should preclude its objecting to complainant's non-compliance, the section is a nullity. It is, by its very clear terms, however, not a nullity, but is one of the operative terms of the contract, and complainant's argument with reference to it must fall.

■ Since Schertz elected to keep the contract alive, his duty to comply with the terms of the contract continued. His publication of the article revealing the secrets of the process was a breach of this duty, for which he must answer in damages. The decree of the court holding that defendant was not entitled to be heard upon its allegations of damage in its cross-bill was erroneous.

Defendants admit their indebtedness to complainant for the unpaid salary item, which forms no part of the contract in issue. They also admit the accrual of royalties upon the sales of the chlorophyll extract, but maintain that the complainant's breach of contract precludes his recovery of these royalties. We are faced, then, with the question of whether a defaulting licensor is entitled to recover from a licensee, who is also in default, for the contractual share of the benefits accrued prior to the licensor's default. This, in turn, must depend in large measure on the question of whether the contract is entire or divisible. If the contract is entire, then Schertz's breach, clearly a material one, will preclude his recovering even for his partial performance prior to his breach.

Defendants maintain that the contract was entire; that, although they promised to pay Schertz royalties at regular intervals, still the consideration moving from him was a promise for exclusive licensing rights, and that this consideration is not divisible. They aver, in other words, that no part performance on Schertz's part is possible, and that he has not performed at all until he has secured to them their exclusive licensing rights for the full twenty-five years. Any default before the expiration of the twenty-five year period, they say, constitutes a total failure of consideration, relieving them of any obligations on the contract, and, moreover, entitling them to sue for the recovery of royalties, if any had been paid.

■■■■. We prefer to view the case differently. The general rule that a party who has failed fully to perform his contract cannot recover for a part performance of the contract has no application to a case where one has partially performed a divisible or severable contract and later breaks it. A recovery may be had for part performance of a divisible contract, and such a recovery is not barred by a subsequent breach by the party who seeks the recovery. However, in an action upon a partly-performed contract the defendant may set up the plaintiff's breach of the contract as the basis

for a counter-claim for damages. This principle is clearly set forth in 12 Am. Jur., *Contracts*, section 348.

Upon a careful analysis of the consideration moving from Schertz it will be seen that his promise of an "exclusive license" contemplates a dual performance: first, the delivery of the secret process, and second, a refraining from the delivery of such process to anyone else. Included in the latter is also an implied promise not to disclose in any way any of the secrets which will make competition possible. (That is, Schertz promised expressly not to license a competitor and impliedly not to release his secrets to the world at large.) When he turned over the secret process to defendants, he completed the first part of the performance required of him, and the contract was to that extent executed upon his part.

It is the second part of his agreement which the complainant, by reason of the publication of his article, has broken. We hold, however, that this portion of his agreement is not entire, but may be apportioned to every moment of time during which his forbearance to disclose made possible the unhampered use of these secrets by the defendants. From November, 1935, to September, 1938, complainant remained silent, thus fulfilling his agreement and furnishing an adequate consideration for royalties accruing during that period. These royalties the defendants must pay.

In *Skinner* v. *Walter A. Wood Mowing & Reaping Machine Company*, 65 Hun 622, 20 N. Y. S. 251, defendants acquired the exclusive right to use complainant's invention on mowers and reapers manufactured by them, agreeing to pay a reasonable price for the use thereof. The question of whether such a contract was entire or divisible was discussed at length by the commissioner appointed in the case, and his conclusion, which was approved by the New York Supreme Court, was that it was a divisible contract, despite the fact that no intervals for payment were stipulated. This holding was sustained by the New York

Court of Appeals in 140 N. Y. 217, 35 N. E. 491, 37 Am. St. Rep. 540.

The general rule that the entirety or divisibility of the contract is dependent on the intention of the contracting parties is affirmed in *Eschner* v. *Eschner*, 146 Va. 417, 131 S. E. 800. The terms of the contract and the performance expected in that case, however, have no relation to the case at bar, and we hold that the contract in question here is a divisible one.

There are cases, of which *Wilfley* v. *New Standard Concentrator Company*, 164 F. 421, 90 C. C. A. 543, is a good example, holding that the breach by a licensor of a covenant to protect licensees against infringement of the granted patent rights is such a breach of a mutual and dependent covenant that it constitutes a total failure of consideration, and will prevent any recovery on the contract of royalties due the licensor.

It will be noted, however, that in such cases there is a separate covenant to protect licensees against infringement. In cases where there is no such covenant a different conclusion is reached.

In *Jarecki* v. *Hays*, 161 Pa. 613, 29 A. 118, 119, complainant granted to defendants "the sole and exclusive right to manufacture, use, and vend" the patented articles, and subsequently licensed a rival concern to manufacture the same articles. Defendants attempted to resist the payment of these royalties because of the license granted the rival firm. The master appointed by the court said, "There remains then, of the defense to be considered only the alleged violation of the contract on the part of Jarecki in licensing the Jarecki Manufacturing Company to make and sell the article. The maxim that 'he who seeks equity must do equity' is invoked by the respondents, but it cannot go to the length they ask. There may be a question whether * * * this act of Jarecki's, if it be a violation of the contract, will not inure solely to the benefit of the respondents, and permit or enable them to enjoy the fruits of the complainant's invention without accounting for the royalties. Unquestion-

ably this act, if it were a violation of the contract, would justify the respondents in treating it as at an end. It would relieve them of their implied contract to prosecute the manufacture and sale of the articles, or, as it is called, 'practice the invention,' but it will not relieve them from the payment of royalties if they continue the manufacture and sale of the articles * * * ." The Pennsylvania court approved the master's opinion *in toto*.

The law seems clear that so long as a licensee continues to manufacture under a license he must pay the royalties he has agreed to pay, unless and until he renounces the license and gives notice that he will no longer operate thereunder. *Skinner* v. *Walter A. Wood Mowing & Reaping Machine Company, supra; Hurd* v. *Gere,* 27 App. Div. 625, 50 N. Y. S. 235; *Skidmore* v. *Fahys Watch-Case Company,* 28 App. Div. 94, 50 N. Y. S. 1016; *Jarecki* v. *Hays, supra.* The theory of these cases is that since the licensee in fact secured the benefits under the license, he should not be allowed to refuse to pay accrued royalties. See also, *Rosenthal Paper Company* v. *National Folding Box & Paper Company,* 226 N. Y. 313, 123 N. E. 766, and 3 Williston, *Contracts,* (Rev. Ed.) section 872.

Defendants urge that the value of the secret process was "progressive and cumulative," and that any royalties were in payment for improvements to be made by Schertz in subsequent years as well as for the right to manufacture under the processes already granted. In the section of Williston just cited (section 872), this situation is discussed, and it is observed that the injured party should be allowed to refuse to perform, if the bargain is still wholly executory, or to rescind if it is executed, provided the performance received from the other party can be restored. "But so long as the defendant has received and retains the performance for which he promised to pay a fixed sum, it is going in the teeth of the express terms of the contract to excuse him from liability. Under such circumstances, he must seek redress for non-performance of other promises in a cross-action or counterclaim, and this is true even though without fault on

his part he is unable to put the other party in *statu quo* by returning the performance he has received." Williston, *op. cit.*, page 2455.

And in the footnotes to the same section (section 872) the following is found: "Thus, in *Simpson* v. *Crippin,* L. R. 8 Q. B. 14, the contract was to take monthly for a year a certain quantity of coal at a certain price per ton; the value of the coal is less in mid-summer than in mid-winter, yet a debt for the contract price would arise for coal furnished under the contract at any season.

"When a young graduate of a law school enters into a contract for a year's employment in an office at a certain salary for each month, he obtains a right to his monthly salary by finishing his first month's service, irrespective of his future failure to perform the remainder of the contract, yet it is obvious that his services at the beginning of the term are of slight value."

The defendants in the case at bar gave notice to the complainant that his publication of the article was a breach of the contract, and that they would no longer consider themselves bound by the contract. For royalties accruing prior to this breach, however, defendants are liable, and the trial court was correct in awarding complainant these royalties.

Upon the whole case, the comment in 5 Williston, *Contracts* (Rev. Ed.), section 1334, is pertinent: "The situation (repudiation) must not be confused with one where there has been a material breach of a contract which does not, however, indicate any intention to renounce or repudiate the remainder of the contract. In such a case the injured party has a genuine election offered him of continuing performance or of ceasing to perform, and any action indicating an intention to continue will operate as a conclusive choice, not, indeed, depriving him of a right of action for the breach which has already taken place, but depriving him of any excuse for ceasing performance on his own part."

The defendant may or may not have been damaged by the disclosure of the secret process. Whether it could profitably have continued in this field without the appear-

ance of competition for the remainder of the twenty-five years, or whether it might have voluntarily ceased to practice the invention at some time within the period if no disclosure had been made are matters referable to the lower court.

That portion of the decree allowing Schertz the salary and the royalties is affirmed. That portion of the decree in which the chancellor refused to hear evidence tending to sustain the allegations of the cross-bill touching the damage the defendant may have sustained by reason of Schertz's disclosure of the secret processes is reversed and the court below is directed to hear such evidence and determine if the defendant sustained any damage by reason of the disclosure. If it be shown that damage was sustained and the amount be determined, the decree of the court should award the amount thereof to the defendant. If the lower court be so advised, a jury may be empanelled to ascertain such damages, provided any were sustained by the American Chlorophyll, Inc.

*Affirmed in part; reversed and remanded in part.*