73 F.3d 357
NOTICE: Fourth Circuit Local Rule 36(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
 J. DAVID CONTI, Inc., Plaintiff-Appellant,
v.
STOKES EQUIPMENT COMPANY, INC., Defendant-Appellee.
 No. 94-2647.
 United States Court of Appeals, Fourth Circuit.
 Argued: October 30, 1995.
Decided: December 22, 1995.
 
 Before MURNAGHAN, HAMILTON, and MOTZ, Circuit Judges.
 OPINION
 PER CURIAM:
 
 
 1
 Appellant, J. David Conti, Inc. (ESI),[1] appeals the district court's entry of judgment in favor of the appellee, Stokes Equipment Company, Inc. (Stokes), following a bench trial in a breach of contract action. We affirm.
 
 
 2
 * Stokes contracted with the Dole Food Company (Dole) in September 1993 to design and install an automated basket handling system at Dole's food processing plant in Yuma, Arizona (the Dole Contract). Subsequently, Stokes awarded the principal subcontract on this project to ESI (the Subcontract). The Subcontract called for ESI to manufacture and install an automatic conveyor system in Dole's plant in Yuma, Arizona by November 1, 1993.
 
 
 3
 The present dispute partly stems from an August 17, 1993 meeting during the bidding process on the Subcontract. The president of ESI, J. David Conti (Conti), the vice president of ESI, Joe Zander (Zander), the Stokes salesperson responsible for the Dole Contract, Les Patkos (Patkos), and the Stokes project engineer on the Dole Contract, Robert Moyer (Moyer), attended this meeting. At the meeting, Patkos told Conti and Zander that Stokes would send them fabrication drawings[2] in incremental stages. Patkos also told them that the Dole Contract had to be completed by November 1, 1993, because it was on the fast track.
 
 
 4
 The next day ESI submitted its proposal to Stokes. ESI's proposal guaranteed that for $224,700[3] it would manufacture a fully automatic basket handling conveyor system composed of three conveyor lines (conveyor system), would fully test and debug the conveyor system's electrical system, and would install the conveyor system at Dole's Yuma, Arizona plant. ESI also guaranteed shipment by October 13, 1993, and installation, including operation in automatic mode, by November 1, 1993.[4]
 
 
 5
 Stokes released the fabrication drawings to ESI in incremental stages. A week after Stokes awarded ESI the Subcontract, September 10, 1993, Stokes sent ESI the fabrication drawings that represented the majority of the parts needed for completing the conveyor system. And by October 8, 1993, Stokes had sent ESI all the fabrication drawings needed to complete the conveyor system, except for some later drawings that were minor revisions of the previous fabrication drawings.
 
 
 6
 Nonetheless, ESI fell behind schedule. On November 5, 1993--a week after the date when the three conveyor lines should have been fully wired and tested--only one line was even partially wired. Further, none of the lines were tested and debugged.
 
 
 7
 The second part of this dispute arises from ESI's efforts to wire the conveyor system. Initially, ESI had planned for Kirk Ammons (Ammons), the electrician who had designed the electrical system, to wire and debug the conveyor system at its Virginia plant. But, because ESI fell behind schedule, the conveyor system had to be shipped to Yuma before he could wire and debug the conveyor system. ESI could not send Ammons to Yuma because he had resigned from ESI. Instead, ESI assigned Chris Conti and George Cox to perform the electrical work on the conveyor system.
 
 
 8
 After the conveyor system was installed, ESI's crew finished wiring it. But the conveyor system malfunctioned. It only ran in semiautomatic mode, rather than in automatic mode as called for in the Subcontract. ESI attempted to fix this problem by sending Mark James and Richard Arnold back to Yuma to work on the conveyor system. They worked on the conveyor system from the fourth of December to the sixth, and although they were able to get the conveyor system to run in semi-automatic mode, they were unable to get it to operate in automatic mode. Consequently, the conveyor system ran in semi-automatic mode from December 1993 to April 1994, and only after Stokes rewired it in April 1994, did it run in automatic mode.
 
 
 9
 Believing ESI's failure to timely install an automatic conveyor system constituted a breach of the Subcontract, Stokes refused to pay ESI the remaining balance of the Subcontract ($116,393). ESI subsequently instituted this action to recover the balance and to recover $24,155 in "upcharges" for additional labor and wasted materials. Significantly, ESI's complaint alleged only one cause of action--breach of contract. Stokes answered and, of course, denied breaching the Subcontract.
 
 
 10
 The parties agreed to a bench trial. In framing the issues for trial, the district court's pretrial order found the predominant issue for trial was whether ESI breached the Subcontract. ESI's theory at trial was that it fully performed the Subcontract. See Appellant's brief at 3 ("ESI ... filed this action, alleging that it completely performed the contract and that Stokes breached the contract ....") (emphasis added). Since ESI believed that it had fully performed the Subcontract, it failed to present any evidence on what the value of a semiautomatic conveyor system was or what it would cost to remedy the conveyor system's defects.[5]
 
 
 11
 Following the bench trial, the district court entered judgment in favor of Stokes. Despite ESI's contrary arguments, the district court found that ESI had substantially breached the Subcontract. The district court further found that the substantial breach precluded ESI from recovering any damages based on the Subcontract. Finally, even though ESI did not assert a claim under quantum meruit in its complaint, in the trial, or in its post-trial memoranda, the district court found that ESI could not recover under quantum meruit.
 
 
 12
 Subsequently, ESI filed a motion, under FED. R. CIV. P. 59, to amend the judgment asserting the district court committed various errors of law, including failing to apply the doctrine of judicial estoppel. The district court denied ESI's motion, and ESI timely filed its notice of appeal from the district court's order denying it relief under its complaint and the order denying its motion to amend the judgment.
 
 II
 
 13
 ESI first challenges three of the district court's findings of fact as clearly erroneous: (1) ESI's three-week delay in installing the conveyor system was due to its work on another conveyor system; (2) the conveyor system failed to run in automatic mode because ESI defectively wired it; and (3) under these facts, ESI's breach of the Subcontract was substantial. A district court's findings of fact cannot be set aside unless they are clearly erroneous. FED. R. CIV. P. 52(a). When two or more permissible views of the evidence exist, the district court's choice of one view cannot be clearly erroneous. Anderson v. City of Bessemer, 470 U.S. 564, 574 (1985). "A finding [, however,] is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Co., 333 U.S. 364, 395 (1948).
 
 
 14
 * First, ESI argues that the district court's factual finding that its work on a conveyor system for another customer caused the threeweek delay in performing the Subcontract was clearly erroneous. We disagree because substantial evidence exists to support this finding.
 
 
 15
 Kirk Ammons, the designer of the electrical system, testified that all ESI's employees who worked on the floor were working on another project--a chlorine tablet conveyor system (chlorine system)--in late September 1993. Ammons further testified that in mid-October a majority of the floor employees were still working on the chlorine system. Even Joe Zander, ESI's vice president, conceded that sixty to seventy-five percent of ESI's work force was working on the chlorine system in early October. Specifically, Ammons testified that ESI's work on the chlorine system prevented any work from being done on the Subcontract because the chlorine system "was tying up all the shop floor to the point where they couldn't build anything else to speak of until they got it out of the way." (J.A. 479-80).
 
 
 16
 Les Patkos, the Stokes salesperson responsible for the Dole Contract, also provided testimony that supported the district court's factual finding. Patkos stated that on October 18, 1993, over a month after Stokes had sent fabrication drawings that represented the majority of the parts needed for completing the conveyor system, "it looked like [ESI was] pretty much just starting on the [Subcontract]." (J.A. 378). Patkos also testified that at this time he "did not see a single welded frame assembly. I saw some legs [that] were put together. I saw some side frames that were sheered and formed. I saw some screw-in feet that were fabricated. That's pretty much it." (J.A. 379).
 
 
 17
 Finally, Robert Moyer, Stokes' project engineer on the Dole Contract, provided testimony to support the district court's factual finding. Moyer arrived at ESI's plant on October 26, 1993, to work on the hydraulic system of the conveyor system. At this time, he saw that ESI was doing a lot of work on the conveyor system, but he also saw that ESI was still working on the chlorine system. In light of the testimony of Ammons, Patkos, and Moyer, the district court's finding that ESI's delay was caused by work on another project was not clearly erroneous.
 
 B
 
 18
 Second, ESI argues that the district court's factual finding that it defectively wired the conveyor system was clearly erroneous. We disagree because substantial evidence exists to support this finding.
 
 
 19
 The district court's finding that ESI defectively wired the conveyor system is amply supported by the evidence in the record. First, ESI's own employees believed that the conveyor system was defectively wired. Mark James (James), ESI's field supervisor in Yuma, wrote in his field notes that "[t]he electrical part of the systems was poorly done and was our fault." (J.A. 986).
 
 
 20
 Second, ESI sent unqualified personnel to Yuma to wire the conveyor system. The two ESI employees who wired the conveyor system were George Cox and Chris Conti. James described Cox as "very incompetent" and "good for telling what to do only." (J.A. 977). And Chris Conti was not a licensed electrician.
 
 
 21
 Finally, the testimony of Stokes' expert witness, Jeffrey Sklar, shows that the wiring job was defective.
 
 
 22
 Q. Mr. Sklar, when you reviewed the installation work, did you come to an opinion as to the workmanship?
 
 
 23
 A. It was pretty poor, basically. Based on what I saw, it was--the installation was pretty poorly done.
 
 
 24
 Q. Okay. And what did you base that conclusion on?
 
 
 25
 A. There were wires exposed, like I mentioned, the conduit wasn't tightened, fittings were loose, the holes were made and not plugged in, the photo eyes had water in them....
 
 
 26
 (J.A. 744).
 
 
 27
 ESI, however, contends that James and Richard Arnold, a master electrician, corrected the problems in the electrical system after they returned to Yuma on December fourth. James and Arnold worked on the conveyor system and fixed many of its problems. But they neither rewired the system nor operated the conveyor system in automatic mode. Although James and Arnold did not test the conveyor system in automatic mode, James testified that it would have run properly but for a defective part, which was Dole's responsibility.
 
 
 28
 Q. What was the status of the basket conveyor systems when you and Mr. Arnold left the Yuma plant?
 
 
 29
 A. Well, the system, our system would run.... But they would not run in automatic because of the limit switches.
 
 
 30
 ....
 
 
 31
 Q. If the limit switches had been functioning properly when you left, would the system have operated in automatic?
 
 
 32
 A. Yes, sir, I feel they would work fine.
 
 
 33
 (J.A. 288-89).
 
 
 34
 But, even after Dole replaced the limit switches, the conveyor system failed to operate in automatic mode, as called for by the Subcontract. Indeed, the conveyor system never properly functioned in automatic mode until Stokes rewired it in April 1994. Thus, substantial evidence supports the district court's finding that the conveyor system did not run in automatic mode because ESI defectively wired it.
 
 C
 
 35
 Third, ESI argues that the district court's factual finding that its breach was substantial was clearly erroneous. We disagree.
 
 
 36
 A party substantially breaches the contract when the breach substantially frustrates the purpose of the contract, rather than a trivial aspect of the contract. See Ballou v. Basic Constr. Co., 407 F.2d 1137, 1140 (4th Cir.1969) (applying Virginia law); see also Jacob & Youngs, Inc. v. Kent, 129 N.E. 889 (N.Y.1921) (Cardozo, J.). Here, the Subcontract called for ESI to install a fully automatic conveyor system by November 15, 1993. In light of ESI's three-week delay in wiring the conveyor system and its failure to get the conveyor system to operate in automatic mode, we cannot say that the district court was clearly erroneous in finding that these failures equalled a substantial breach of the Subcontract.
 
 III
 
 37
 We now turn to the question of whether ESI can recover under the Subcontract even though it substantially breached the Subcontract. According to Corbin, a majority of jurisdictions take the view that "[a] contractor whose breach is such that he has rendered less than 'substantial performance' has no right to the contract price; he is said to have no remedy 'on the contract.' " ARTHUR L. CORBIN, 3A CORBIN ON CONTRACTS Sec. 710 at 342 (1960).[6] Virginia law is in accord with the majority rule. See American Chlorophyll, Inc. v. Schertz, 11 S.E.2d 625, 629 (Va.1940) ("If the contract [between the parties] is entire, then Schertz's breach, clearly a material one, will preclude his recovering even for his partial performance prior to his breach."). Here, because ESI substantially breached the Subcontract, Virginia law precludes recovery on the Subcontract.
 
 
 38
 In any event, assuming Virginia law would allow recovery for ESI's partial performance of the Subcontract, see RESTATEMENT (SECOND) OF CONTRACTS Sec. 374(1) (1979) (stating "the party in breach is entitled to restitution for any benefit that he has conferred by way of part performance ..."), ESI did not show that it was entitled to such a recovery. "The burden of proving the value of[its] part performance is assuredly upon [ESI]." ARTHUR L. CORBIN, 5A CORBIN ON CONTRACTS Sec. 1124 at 16 (1964). Since ESI tried this case solely on the theory that it fully performed the Subcontract, see Appellant's brief at 3 ("ESI ... filed this action, alleging that it completely performed the contract and that Stokes breached the contract ....") (emphasis added), it failed to meet its burden. Apart from the Subcontract price, ESI did not introduce any evidence showing the reasonable value to Stokes of ESI's deficient performance.[7]
 
 IV
 
 39
 Next, ESI argues that the district court erred in concluding that it could not recover under quantum meruit. We disagree.
 
 
 40
 The existence of an express, enforceable contract between Stokes and ESI precludes ESI's claim under quantum meruit. See Raymond, Colesar, Glaspy & Huss, P.C. v. Allied Capital Corp., 961 F.2d 489, 491 (4th Cir.1992) (finding that under Virginia law "[o]ne cannot obtain quantum meruit relief from another if he has expressly delineated the contractual obligations the two will have on the subject in question"); Ellis & Myers Lumber Co. v. Hubbard, 96 S.E. 754, 760 (Va.1918) ("It is only in absence of an express or of an enforceable contract between the parties that the law ... will, from circumstances, imply a contract between them.").
 
 
 41
 In any event, quantum meruit was never properly before the district court. ESI never raised the issue of quantum meruit until it moved to amend the judgment under FED. R. CIV. P. 59. Instead, ESI tried this case solely on the theory that it had fully performed the Subcontract. See Appellant's brief at 3 ("ESI ... filed this action, alleging that it completely performed the contract and that Stokes breached the contract ....") (emphasis added). Having tried the case on that theory, quantum meruit could not form the basis of recovery. See Five Lakes, Inc. v. Randall, Inc., 196 S.E.2d 906 (Va.1973) (per curiam ) (finding that a plaintiff cannot have its case submitted to the jury on the theory of quantum meruit when it brings and tries the case on a breach of contract theory).
 
 V
 
 42
 Finally, ESI argues that the district court erred in finding the doctrine of judicial estoppel did not apply in this case. ESI argues that Stokes gained an unfair advantage because it asserted inconsistent legal positions in its proposed findings of fact and conclusions of law and its post-trial memoranda. Assuming arguendo that Stokes asserted inconsistent legal positions, we find the doctrine of judicial estoppel does not apply to such a change of position.
 
 
 43
 "In order to invoke judicial estoppel, a party must show that the opponent took a contrary position under oath in a prior proceeding and that the prior position was accepted by the court.... Although this limit allows parties to contradict themselves in court, it threatens only the integrity of the parties, not of the court." Teledyne Indus., Inc. v. NLRB, 911 F.2d 1214, 1218 (6th Cir.1990) (citations omitted).
 
 
 44
 In this case, Stokes made its initial argument in its proposed findings of fact and conclusions of law. The district court, however, never accepted this argument. Thus, the doctrine of judicial estoppel is simply inapplicable to Stokes' subsequent change of legal position.
 
 VI
 
 45
 For all the foregoing reasons, the judgment of the district court is affirmed.
 
 
 46
 AFFIRMED.
 
 MURNAGHAN, Circuit Judge, concurring:
 
 47
 I concur, and bother to express my views only because a casual review of the majority opinion might lead a reader to the conclusion that a substantial fact, probably leading to a different result, had been unmentioned. The fact is that Stokes entered its subcontract with ESI in order to have constructed a lettuce conveyor system which Stokes would sell and deliver to Dole. A conveyor system, which was partly constructed by ESI, although only completed by Stokes, was, in fact, delivered to Dole. Dole thereupon paid to Stokes the full amount of the purchase price ($393,311). The amount Stokes paid to ESI ($142,740) plus the expenditures which Stokes was obliged to incur to make the conveyor system deliverable to Dole ($91,394) together were less than the contract price in the agreement between Stokes and ESI ($259,133) by $24,999. To that extent, Stokes appears to have been unjustly enriched.
 
 
 48
 However, as the majority opinion clearly establishes by the pleading and all other relevant aspects of the case as tried, ESI lodged only a breach of contract claim and its proof was insufficient. No quantum meruit claim was advanced by ESI, and in the absence of such pleading, under Virginia law, no quantum meruit recovery may be had. Five Lakes, Inc. v. Randall, Inc., 196 S.E.2d 906, 907 (Va.1973) (per curiam); Griffin v. Rainer, 186 S.E.2d 10, 12 (Va.1972).
 
 
 49
 The district judge, in explaining why there could be no recovery for breach of contract, also opined that there could be no quantum meruit recovery because of failure of proof. Whether he was correct in his logic, he was correct in result: no quantum meruit claim had been asserted and Stokes had not, as a consequence, been alerted to defend such a claim.
 
 
 
 [1]
 During the course of this action, J. David Conti, Inc. was substituted as the proper party plaintiff in the place of Electric Service, Inc
 
 
 [2]
 Fabrication drawings show the manufacturer of a conveyor system the number and specifications of the parts that are needed to build the conveyor system
 
 
 [3]
 The total amount of the contract came out to be $259,133 because the parties agreed to a change order in the amount of $8,933 and an addendum in the amount of $25,500
 
 
 [4]
 These dates, however, were later changed by the agreement of both parties. The amended dates extended the shipment deadline to October 29, 1993, and the installation deadline to November 15, 1993
 
 
 [5]
 In pursuing its counterclaim against ESI, which Stokes abandoned once the district court found ESI had substantially breached the contract, Stokes introduced evidence showing that its cost to remedy the conveyor system was $91,394
 
 
 [6]
 See, e.g., Western Distrib. Co. v. Diodosio, 841 P.2d 1053, 1057 (Colo.1992) (en banc ) ("The 'performance' element in a breach of contract action means 'substantial' performance."); VRT, Inc. v. Dutton-Lainson Co., 530 N.W.2d 619, 623 (Neb.1995) (stating that to bring an action on the contract, the plaintiff must first establish that it substantially performed its obligations under the contract); West Virginia Human Rights Comm'n v. Smoot Coal Co., Inc., 412 S.E.2d 749, 754 (W.Va.1991) (per curiam ) ("It has been recognized in a number of jurisdictions that perfect performance is not required with every contract, but that recovery may be had on a contract which has been substantially performed and that only a material failure of performance by one party discharges the other.")
 
 
 [7]
 The Subcontract price alone, however, is not sufficient evidence. See RESTATEMENT (SECOND)OF CONTRACTS Sec. 374 cmt. b