**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 16-1555

BAYER CROPSCIENCE LP,

Plaintiff – Appellant,

v.

ALBEMARLE CORPORATION,

Defendant – Appellee.

Appeal from the United States District Court for the Eastern District of North Carolina, at Raleigh.  Terrence W. Boyle, District Judge.  (5:14-cv-00412-BO)

Argued:  March 22, 2017                           Decided:  June 20, 2017

Before GREGORY, Chief Judge, and MOTZ and SHEDD, Circuit Judges.

Affirmed in part, reversed in part, and remanded by unpublished opinion.  Judge Shedd wrote the opinion, in which Chief Judge Gregory and Judge Motz joined.

**ARGUED:** Pressly McAuley Millen, WOMBLE CARLYLE SANDRIDGE & RICE, LLP, Raleigh, North Carolina, for Appellant. Stephen Montgomery Cox, ROBINSON, BRADSHAW & HINSON, P.A., Charlotte, North Carolina, for Appellee. **ON BRIEF:** Samuel B. Hartzell, WOMBLE CARLYLE SANDRIDGE & RICE, LLP, Raleigh, North Carolina, for Appellant. John R. Wester, David C. Kimball, ROBINSON, BRADSHAW & HINSON, P.A., Charlotte, North Carolina, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

SHEDD, Circuit Judge:

Bayer Cropscience LP ("Bayer") appeals the district court's grant of summary judgment in favor of Albemarle Corporation ("Albemarle"), on its claims seeking a declaratory judgment, alleging breach of contract, and alleging a violation of the North Carolina Unfair and Deceptive Trade Practices Act ("UDTPA"). For the following reasons, we affirm in part, reverse in part, and remand for further proceedings.

I.

Methyl bromide is a chemical compound that companies such as Bayer use in herbicide. Bromine is an essential component of methyl bromide, and only two companies in the world have commercially available access to elemental bromine reserves in the United States, Albemarle and Chemtura Corporation ("Chemtura"). Albemarle no longer manufactures methyl bromide itself, but pays Chemtura to convert, or "methylate," Albemarle's elemental bromine into methyl bromide. This process and relationship is referred to as "tolling," and Chemtura charges Albemarle a "tolling fee."

In early 2000, Albemarle and Bayer's predecessor entered into a Methyl Bromide Sales Agreement (the "Agreement") requiring Bayer to purchase 80% of its methyl bromide volume from Albemarle. The Agreement was for a term of four years and contained automatic one-year renewals that either party could opt-out of by giving 12-months' notice before the year-end termination date. Thus, in December either party could terminate the Agreement effective the following December, but in January a notice of termination would become effective 23 months later. The parties continued to renew the Agreement until Bayer terminated it effective December 31, 2015.

3

Initially, the Agreement contained a "meet-competition" or "meet or release" provision which gave Bayer the right to shop for a better price and purchase methyl bromide from another seller, but only if Albemarle first refused to match that seller's price. The initial iteration of the Agreement also provided that Bayer would purchase methyl bromide from Albemarle at a price of $0.5123 per pound. However, the Agreement contained an open-price provision or price-revision clause permitting Albemarle to unilaterally "raise prices . . . on the first day of any quarter upon written notice mailed no less than fifteen (15) days prior to the effective date." J.A. 22.

The parties amended the Agreement five times between its commencement and December 2013. Each time the Agreement was amended, the price was increased, ultimately reaching $1.85 per pound by January 1, 2012. Additionally, a 2009 amendment altered the volume requirement and the "meet or release" provision. It required Bayer to purchase 80% of its methyl bromide from Albemarle regardless of whether another supplier offered a better price. However, Bayer retained its "meet or release" option on 20% of its methyl bromide purchase volume.

In January 2014, Albemarle told Bayer to expect significant price increases based on an increased tolling fee charged by Chemtura, and on February 13, 2014, Bayer provided notice to Albemarle of its intent to terminate the Agreement, effective December 31, 2015. Particularly relevant to this appeal are the three amendments and events occurring after Bayer provided notice of its intent to terminate the Agreement. On March 13, 2014, Albemarle notified Bayer of a price increase from $1.85 to $4.09 per pound, effective April 1, 2014 (hereinafter referred to as the "first price increase"). On

4

April 14, 2014, Bayer purchased 20% of its annual methyl bromide from Chemtura at $2.30 per pound and ignored the "meet or release" provision by failing to give Albemarle the opportunity to match Chemtura's price. On June 11, 2014, Albemarle gave Bayer notice of another price increase, and effective July 1, 2014, the price increased to $8.49 per pound (hereinafter referred to as the "second price increase"). Finally, in March 2015, Albemarle notified Bayer of a final price increase, effective April 1, 2015, to $11.04 per pound (hereinafter referred to as the "third price increase"). Pursuant to Bayer's termination, the Agreement ended on December 31, 2015.

On June 30, 2014, Bayer filed suit against Albemarle in North Carolina state court, and Albemarle subsequently removed the case. In its complaint, Bayer alleges three causes of action: (1) declaratory judgment under Virginia law[1] that Albemarle's final three price increases were made in bad faith in violation of Virginia's implementation of the Uniform Commercial Code ("UCC"), Va. Code Ann. § 8.1A-101 *et seq*.; (2) breach of contract under Virginia law based on Albemarle's allegedly commercially unreasonable and dishonest conduct; and (3) unfair and deceptive acts or practices in violation of North Carolina's UDTPA, N.C. Gen. Stat. § 75-1.1(a). At its core, Bayer's complaint alleges that Albemarle used its contractual leverage–under the open-price provision–to artificially inflate the price of methyl bromide in violation of the good faith and fair dealing requirements of the UCC. Albemarle filed a counterclaim for breach of

---

[1] The Agreement contained a Virginia choice of law provision, and the parties agree the Virginia law governs the Agreement.

5

contract alleging that Bayer breached the Agreement by purchasing methyl bromide from other sources without giving Albemarle the opportunity to price match.

## II.

Upon considering cross motions for summary judgment, the district court granted Albemarle's motion for summary judgment, granted in part and denied in part Bayer's motion for summary judgment, and dismissed all claims and the counterclaim.[2] Importantly, in reaching its judgment the court narrowed the issues surrounding Bayer's claims by determining that Bayer materially breached the Agreement in April 2014 by violating the Agreement's "meet or release" provision. According to the court, once Bayer materially breached the Agreement, it was no longer entitled to enforce the Agreement under Virginia's first material breach doctrine. Thus, the district court only considered claims based on the first price increase.

This Court reviews a grant of summary judgment de novo. *Wilkins v. Montgomery*, 751 F.3d 214, 220 (4th Cir. 2014). Summary judgment is appropriate only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if a reasonable jury could return a verdict for the nonmoving party," and "[a] fact is material if it might affect the outcome of the suit under the governing law." *Libertarian Party of Virginia v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (citations and internal quotation marks omitted).

---

[2] Albemarle does not appeal the dismissal of its counterclaim.

The issues on appeal are as follows: (1) whether Albemarle is entitled to summary judgment on Bayer's declaratory judgment and breach of contract claims related to the first price increase; (2) whether Albemarle is entitled to summary judgement on Bayer's UDTPA claim; and (3) whether Virginia's first material breach doctrine prevents Bayer from asserting declaratory judgment and breach of contract claims related to the second and third price increases. We address each in turn.

A.

Regarding Bayer's first two causes of action related to the first price increase, the district court found that Bayer failed to demonstrate that a genuine issue of material fact exists as to whether Albemarle acted in a commercially unreasonable manner or in bad faith by increasing the price from $1.85 to $4.09 per pound. Under the UCC, where there is an open-price provision, a price to be fixed by the seller "means a price for him to fix in good faith." Va. Code Ann. § 8.2-305(2). "Good faith includes observance of reasonable commercial standards of fair dealing in the trade." *Id.* cmt. 3. Virginia courts have indicated that a "party that is to set the price does not have the power to act arbitrarily" and must "treat alike all consumers similarly situated." *Am. Trading & Prod. Corp. v. Fairfax Cty. Bd. of Sup'rs*, 200 S.E.2d 529, 532 (Va. 1973). However, there is no specific test for what constitutes commercially reasonable action under the open price provision of the UCC, and a court must look to the facts of the case to determine whether conduct is commercially reasonable or unreasonable. Here, the court determined that the

7

$4.09 per pound price was reasonable because it was set through a value-based analysis,[3] it reflected Chemtura's increased tolling fee, and there was no evidence of discriminatory or commercially unreasonable pricing strategies. The court further indicated that Albemarle's use of its contractual leverage was not bad faith but an exercise of its rights under the Agreement.

Having reviewed the record and the applicable law, we affirm the grant of summary judgment and dismissal of these claims based substantially on the reasoning of the district court.

B.

We next address the district court's dismissal of Bayer's UDTPA claim. The primary basis for this claim is a statement made by Wesley Ware, Albemarle's Global Project Manager, whereby he expressed that the first price increase was a complete cost pass through of the increased tolling fee charged by Chemtura. Because the first price increase was not solely the result of the increased tolling fee, Bayer claims that this supposed misrepresentation was unfair and deceptive.[4]

---

[3] In early 2014, Albemarle adopted a "Value-In-Use" analysis to determine the appropriate price for methyl bromide. The analysis allowed Albemarle to estimate the value that methyl bromide bore to the overall value of Bayer's herbicides in the marketplace.

[4] Notably, this statement is not objectively false when considered in its precise context. A Bayer representative asked Ware whether "the increase being passed through is . . . purely as a result of the increase in tolling fee . . . or are there other factors in there?" J.A. 259. Ware responded: "No. It's a complete 100% cost pass through. I mean that's pretty much it. There's nothing in there that's opportunistic or punitive in any way." *Id.* This exchange establishes that the increase being *passed through* is solely (Continued)

8

Under North Carolina law, to establish a prima facie claim under the UDTPA a plaintiff must show: "(1) defendant committed an unfair or deceptive act or practice, (2) the act[] in question is in or affecting commerce, and (3) the act proximately caused injury to the plaintiff." *Dalton v. Camp*, 548 S.E.2d 704, 711 (N.C. 2001) (citation omitted). Furthermore, a mere breach of contract will only support an unfair and deceptive trade practice claim if it is "surrounded by substantial aggravating circumstances," *Griffith v. Glen Wood Co., Inc.*, 646 S.E.2d 550, 558 (N.C. App. 2007), and when a UDTPA claim is based on an alleged misrepresentation, the plaintiff must establish "reliance on the misrepresentation in order to show the necessary proximate cause," *Bumpers v. Comm. Bank of N.Va.*, 747 S.E.2d 220, 226 (N.C. 2013). In dismissing the UDTPA claim, the district court found that Bayer failed to demonstrate that egregious or aggravating circumstances surrounded Albemarle's statement regarding the basis of the first price increase. Additionally, the court held that Bayer failed to show actual reliance on the alleged misrepresentation.

Having reviewed the record and the applicable law, we affirm the grant of summary judgment and dismissal of Bayer's UDTPA claim based substantially on the reasoning of the district court.

---

based on the increased tolling fee. It says nothing about other factors that may have contributed to the first price increase, e.g., value-based analysis.

C.

Finally, we consider whether Bayer committed a first material breach and whether such a breach bars Bayer from asserting claims related to the second and third price increases. The district court determined that Bayer materially breached the Agreement in April 2014 when it purchased methyl bromide from Chemtura and disregarded the "meet or release" provision. According to the court, once Bayer materially breached the Agreement, it was no longer entitled to enforce the Agreement under Virginia's first material breach doctrine. Thus, Bayer was unable to assert its declaratory judgment and breach of contract claims related to the second and third price increases, which took place after Bayer's first breach.

Under Virginia law, "a party who commits the first [material] breach of a contract is not entitled to enforce the contract," and the breach excuses the nonbreaching party from future performance. *Horton v. Horton*, 487 S.E.2d 200, 203, 204 (Va. 1997) (citations omitted); *see also Hurley v. Bennett*, 176 S.E. 171, 175 (Va. 1934) ("The party who commits the first breach of a contract, is not entitled to enforce it, or to maintain an action thereon, against the other party for his subsequent failure to perform."). "A material breach is a failure to do something that is so fundamental to the contract that the failure to perform that obligation defeats an essential purpose of the contract." *Horton*, 487 S.E.2d at 204.

In briefly deciding this issue, the district court suggested that Bayer conceded that it committed a material breach of the contract. Although our review of the record does not reveal that Bayer conceded this point, we find that it is unnecessary to determine

10

whether Bayer committed a material breach because Virginia's first material breach rule is inapplicable here.

The district court and Albemarle heavily rely on one case from the Supreme Court of Virginia, *Horton*, 487 S.E.2d 200, to support the claim that Bayer's breach renders it unable to enforce the Agreement. In *Horton*, Mr. and Mrs. Horton executed a contract that required Mrs. Horton to execute a power of attorney appointing her attorney to sign certain documents on her behalf. *Id.* at 202. Mr. Horton was obligated to supplement an account when necessary to ensure Mrs. Horton would receive periodic payments due to her under the contract. *Id.* Mrs. Horton committed a material breach by failing to execute the power of attorney. *Id.* Mr. Horton subsequently refused to supplement the account, and the account had insufficient funds to pay all of the expenses required by the contract. *Id.* at 203. Mrs. Horton filed a lawsuit, alleging that Mr. Horton breached the contract. *Id.* The Supreme Court of Virginia, in affirming a lower court ruling dismissing the lawsuit, held that Mr. Horton was excused from performing his contractual obligations based on Mrs. Horton's prior breach. *Id.* at 204 ("Mr. Horton proved a material breach of contract which excused his nonperformance and prevented Mrs. Horton from enforcing the contract.").

The Supreme Court of Virginia reaffirmed this holding in *Countryside Orthopaedics, P.C. v. Peyton*, 541 S.E.2d 279 (Va. 2001). In *Countryside*, a doctor committed the first material breach when he failed to make monthly payments for the purchase of stock pursuant to a stock purchase agreement. *Id.* at 286. Because the supreme court considered the stock purchase agreement as part of one transaction with

11

his employment contract, the court concluded that the doctor could not subsequently enforce a provision in his employment contract regarding severance pay. *Id.* at 287. The employer's nonperformance under the employment contract was therefore excused because the doctor committed the first material breach.

*Horton* and *Countryside* both involve the breaching party attempting to compel performance by the other party: Mrs. Horton could not force Mr. Horton to supplement the account and the doctor in *Countryside* could not compel his employer to provide severance pay. Thus, the opinions stand for the proposition that a first material breach excuses a nonbreaching party's nonperformance. We do not dispute the validity of this rule under Virginia contract law and recognize that it is a well-established contract principle. *See* RESTATEMENT (SECOND) OF CONTRACTS § 237 (1981). However, this is not the precise issue before this Court. Rather, we must determine whether Bayer's prior breach bars it from pursuing an action under the Agreement when Albemarle continued to perform.

*Horton* and *Countryside* do not stand for the conclusion that Bayer's breach bars it from suing Albemarle for Albemarle's subsequent breaches of contract when both parties continued to perform under the contract. Applying the first material breach rule in a manner that excuses potential subsequent breaches when both parties continue to perform would place contractual parties, such as Bayer, in an untenable position. Here, because the parties continued to perform under the Agreement, Bayer was contractually obligated to continue paying the requested prices despite its belief that Albemarle's prices were

unreasonable and set in bad faith. [5] The fact that Bayer made payments to Albemarle under protest after filing its complaint in June 2014 illustrates this. By applying the first material breach rule here, Albemarle theoretically would be permitted to breach the Agreement however it so chose and require Bayer to adhere to its terms, but Bayer would be precluded from ever seeking any contractual remedy for Albemarle's impermissible actions. We do not believe Virginia's first material breach rule, as laid out in *Horton* and *Countryside*, contemplates or intends such a result. *See Am. Chlorophyll v. Schertz*, 11 S.E.2d 625, 628 (Va. 1940) (A defendant "may not keep the contract alive for his own benefit, claiming the royalties thereunder, and at the same time excuse his default by averring that the contract was at an end. He may not in the same breath affirm and disaffirm.").

Further, Albemarle and the district court have failed to cite any Virginia state cases that contemplate the precise question before this Court. Thus, a close reading of Virginia case law indicates that the law is not dispositive on this issue, and assuming arguendo that Bayer committed a material breach, we find that the application of the first material breach rule is improper here.

Therefore, we reverse the district court's dismissal of Bayer's claims pursuant to the first material breach doctrine and remand the case for further proceedings on Bayer's

---

[5] We take no position on the merits of Bayer's claims that Albemarle's second and third price increases constitute a violation of the UCC or breach of the Agreement.

13

claims seeking a declaratory judgment and for breach of contract related to Albemarle's second and third price increases.

III.

Accordingly, we affirm the district court's grant of summary judgment in favor of Albemarle and the dismissal of Bayer's UDTPA claim and claims relating to Albemarle's first price increase. However, we reverse the court's finding that Bayer is unable to pursue declaratory judgment and breach of contract claims based on Albemarle's second and third price increases and remand for further proceedings on these claims.

*AFFIRMED IN PART,*
*REVERSED IN PART,*
*AND REMANDED*